Danny Quintana (SBN 4121)
DANNY QUINTANA PLLC
4198 West 4860 South
Salt Lake City, Utah 84120
801-209-5850
danny_quintana@yahoo.com

*Attorney for Plaintiff Thomas Fry*
_____

IN THE UNITED STATES DISTRICT COURT,
STATE OF UTAH, CENTRAL DIVISION
_____

| | |
|---|---|
| THOMAS FRY,<br><br>               Plaintiff,<br><br>*vs*.<br><br>WINDERMERE REAL ESTATE – UTAH, LLC a Utah Corporation, MAKENZIE KINK. SCOTT STEADMAN, TAKUYA HIRANO. JACQUELYN HIRANO, and DOES 1 through 10, inclusive,<br><br>         Defendants. | **COMPLAINT**<br><br>**REQUEST FOR JURY TRIAL**<br><br>Case No.<br><br><br><br>Judge |

Plaintiff, Thomas Fry brings this action against Defendants and each of them as hereinafter alleged:

## INTRODUCTION

Plaintiff, Thomas Fry purchased a home owned by Defendant Takuya Hirano a citizen and resident of Japan. Mr. Hirano listed the home, which had been vacant for the past four years, with Defendant Windermere Real Estate–Utah, LLC. Windermere as the broker, appointed two of its agents, one to represent the buyer and one to represent the seller. Utah law permits *Limited or Designated Agency* where agents of both buyer and seller can be

1

employed by the same broker. Windermere's employee, Defendant Scott Steadman represented the seller Mr. Hirano as his agent. Defendant Makenzie Kink also an employee and agent of Windermere represented the buyer, Thomas Fry.

Though this type of agency is permitted in Utah, it requires the agents to represent their respective clients as though no designated agency relationship exists and requires the agents to be completely open and honest and make full disclosure to their clients. The agents owed their clients a duty of full disclosure, confidentiality, and fiduciary responsibility. Windermere, Kink and Steadman failed their clients in this respect. Instead, the agents were more concerned about their own commissions and their employer Windermere that was in the position of double-dipping by receiving a commission from both the seller and buyer, than they were about their clients. Buyer's agent, Makenzie Kink hired a licensed and qualified inspector to inspect the home. The inspector found numerous problems with the home and listed them in his detailed report. He also found mold and suggested a mold expert inspect the home. A mold expert was hired and inspected the home. He found severe mold infestation, which would cause a health risk and render the home unhabitable.

Moreover, the cost to repair the problems and abate the mold was far more than anticipated, and the agents, in conflict of interest, and to protect their commissions, conspired to avoid the repairs and went so far as to find a pseudo inspector to say there was zero mold. Mr. Fry's agent failed to disclose the mold inspector's report to him.

Despite the fact that Mr. Fry was out of town on the scheduled day of the closing and requested a two-day extension — from Friday to Monday —, Windermere and its agents

forced Mr. Fry to close by telephone without having a chance to inspect the home by threatening to sell the home to another buyer if he didn't close that Friday.

Once Mr. Fry took possession, he discovered that the repairs had not been made as promised and that the mold infestation was such a health hazard that he and his family could not occupy the home until the mold was abated. It would be months before Mr. Fry and his family could live in the home. This action followed.

## PARTIES

**Plaintiff**

Plaintiff Thomas Fry is a resident of the County of Utah and is the buyer in this action.

**Defendants**

Takuya Hirano is a citizen and resident of Japan and the co-owner of the property that is the subject in this action.

Jacquelyn Hirano is a citizen of the United States and resident of Utah County. She is the sister and U.S. representative of Seller/Defendant Takuya Hirano.

Windermere Real Estate – Utah, LLC is Washington LLC registered to do business in the Sate of Utah, Entity No. 5897546-0161, and is doing business in the County of Utah.

Scott Steadman is a real estate agent residing in the State of Utah and employed by Windermere Real Estate–Utah, LLC and assigned by Windermere to represent the seller Takuya Hirano.

Makenzie Kink is a real estate agent employed by Windermere Real Estate–Utah, LLC and assigned by Windermere to represent the buyer Thomas Fry.

**Doe Defendants**

Doe defendants are unknown at this time and Plaintiff will amend this Complaint to insert their true names when the same become known.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, because the parties are completely diverse in citizenship between buyer and seller and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

Jurisdiction is further conferred under the Federal Trade Commission Act, Section 5, Unfair or Deceptive Acts or Practices.

Exercise of jurisdiction over Defendants is reasonable and proper because Defendants have had extensive contacts with the State of Utah including the unlawful and fraudulent acts alleged in this Complaint.

Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial portion of the acts and omissions alleged herein were committed by Defendants within this District.

## STATEMENT OF FACTS

**TIMELINE**:

1.  The property in question is located at 10417 N Oak Circle, Highland, Utah 84003 and was listed for sale on August 2, 2020.

2.  Plaintiff Thomas Fry visited the property unrepresented by an agent and met Defendant Makenzie Kirk on August 2, 2020. Makenzie was helping her co-worker Defendant Scott Steadman (Sellers Agent) showing properties that day. Makenzie became Fry's Real Estate agent and represented him with the purchase.

4

3.    Seller's Property Condition Disclosure was prepared and executed on July 20, 2020, and under the boxed section "INSTRUCTIONS TO SELLER" in capital letters states:

> SELLER IS OBLIGATED UNDER LAW, REGARDLESS OF OCCUPANCY, TO DISCLOSE TO BUYERS DEFECTS IN THE PROPERTY AND FACTS KNOWN TO SELLER THAT MATERIALLY AND ADVERSELY AFFECT THE USE AND VALUE OF THE PROPERTY THAT CANNOT BE DISCOVERED BY A REASONABLE INSPECTION BY AN ORDINARY PRUDENT BUYER. This disclosure form is designed to assist Seller in complying with these disclosure requirements. Please thoroughly disclose your actual knowledge regarding the condition of the Property. The Company, other real estate agents, and buyers will rely on this disclosure form.
> • Complete the remainder of this form.
> • Please be specific when describing any past or present problems, malfunctions or defects (location, nature of problem, etc.). Use an additional addendum if necessary.

4.    Fry was not permitted more than two visual walk-throughs of the property prior to purchase because according to the Hiranos it was against Japanese culture and tradition and disrespectful to the Seller for a prospective buyer to want to inspect the seller's property prior to purchase.

5.    Fry made an offer on August 3, 2020, with Addendums 1 and 2, accepted by the Sellers on August 5, 2020.

4.    Sellers Property Disclosures were provided to Fry on August 7, 2020.

5.    On August 12, 2020, Veteran Edge Inspections, conducted by its employee Ryan Johnson conducted an extensive inspection of the property. The detailed Inspection Report found numerous problems that were in need of repair.

6.    Addendum 3 to the Real Estate Purchase Contract was signed on August 13, 2020, which moved the Property Disclosure deadline to August 17, 2020, because of the many repair issues discovered by the Home Inspection Report.

7.     Addendum 4 was signed on August 13, 2020, moving the Buyer Due Diligence deadline to August 19.

8.    On August 18, 2020, Defendant Kink sent via email the full inspection report and initial repair list (known at that time) with a memo that the Report was being sent to Seller's Agent, Scott Steadman.

9.   Due to the extensive nature of the required repairs, Addendum 5 was signed on August 19, 2020, moving the Buyer Due Diligence deadline to August 24.

10.   On August 20, Defendant Kink confirmed she had communicated with the mold expert Brent Bowthorpe — "the mold whisperer" — about the water and mold damage to the home including the sliding doors.

11.   On August 21, 2020, a meeting took place in which the Seller's wife was present, the Seller's wife's sibling was present, the Seller was on the phone and the Sellers were made aware of the full extent of the Inspection Report and the need for repairs.

12.   On August 23, 2020, Kink emailed Fry adding Addendum No. 6, which stated:

> 1.   Seller agrees to have all electrical issues "flagged" in the inspection report repaired by a licensed electrician (inspection report has been provided). If Seller is unable to have this completed by closing, one and one half of the bid amount will be escrowed and held at the title company. Title will release funds upon written approval of the Buyer.
> 2.   Seller agrees to fix and make the pool fully functional. If Seller is unable to have this completed by closing, one and one half of the bid amount will be escrowed and held at the title company. Title will release funds upon written approval of the buyer.
> 3.   Seller agrees to repair roof and bring it to code as per the inspection report. If Seller is unable to have this completed by closing, one and one half of the bid amount will be escrowed and held at the title company. Title will release funds upon written approval of the Buyer.
> 4.   Seller agrees to full mold abatement and replacement of both sliding door per the report provided by Brent Bowthorpe with Class One Cleaning Inc. If Seller is unable to have this completed by closing, one
> and one half of the bid amount will be escrowed and held at the title company. Title will release funds upon written approval of the Buyer.

13.   On August 24, the parties signed Addendum No. 6 extending the Due Diligence deadline so the damage and repair costs could be further assessed.

14.   On August 26, Brent Bowthorpe, "the mold whisperer," emailed Kink a bid for additional testing along with some of the necessary repairs, disclosure of water and mold damage to the upstairs and main floor sliding doors, and walls, confirming what Fry had been told, and which all parties had agreed and understood, and also, consistent with the Contract that these items would be repaired. This document from Bowthorpe was never disclosed to Fry. Instead, Kink shared it with Steadman and Windermere, and they conspired to keep it from Fry so the closing would not be delayed, and their commissions affected.

15.   On August 28, Kink sent Fry Addendum No 7 for review and signature, which was the proposal from August 23 confirming repairs being covered at 1.5 times the bids if they were not completed by closing. Fry replied via email to kink expressing a desire to have all repairs completed prior to closing so as not expose Fry to higher costs should there be extensive damage exceeding the 1.5 times bid amount.

**Sellers Property Disclosures**

6.   When asked in the Seller's Property Condition Disclosure at Paragraph 4 if they (Hirano's) were aware of any "leaks, the Hirano's stated, No, "Put brand new roof."

7.   When asked in Seller/s Property Condition Disclosures. If there were any past or present problems or defects with the roof," the Hirano's again stated: No, "Brand new roof." The Hirano's knew this was untrue. The roof was not new and had leaks that caused severe mold damage.

8.   Under paragraph 10 of Seller's Disclosures regarding appliances, the Hirano's stated, "All Brand New."

9.    At Paragraph 13 of the Seller's Property Condition Disclosures regarding Exterior and Exterior Features, the Hirano's answered there were no problems with the pool or hot tub, when in fact the pool had substantial problems with the paint and surface peeling and cracking as well as the pump and heater were not working and had to be replaced, the pool shower had no water and the pool house had damage throughout.

10.    The Hirano's further stated that the sprinkler system was "brand new in July 2019." The Hirano's knew this was untrue.

11.    Regarding Paragraph 18 of the Seller's Disclosures the Hirano's indicated there were no problems with mold when in fact the mold expert found severe mold infestation to such a degree that the Frys could not move into the home until the infestation was abated.

12.    Additionally, regarding Paragraph 18 of the Seller's Disclosures the Hirano's indicated there were no problems with Other Moisture Conditions when in fact the Hirano's and Defendants Steadman and Kink knew the roof had leaked and there was substantial damage caused by moisture that had leaked into the walls and floors. The Hiranos had agreed to have the roof fixed and mold abated in Addendum 7 to the Real Estate Purchase Contract.

13.    Fry's agent Kink intentionally failed to disclose the mold inspection report to Fry, and the Defendants conspired to cover up the mold infestation by painting over it and making it appear as though it had been fixed.

14.    Brent Bowthorpe spoke on the phone with Steadman about the extent of the mold. Steadman argued there was no mold. Steadman told Bowthorpe that he could get a report showing zero mold the next day with a simple phone call to someone. Bowthorpe responded, "I don't doubt that you can have someone come here and run a quick test just to show zero mold. You can get whatever result you want if you know the result you want before you run the actual test. The problem is that the damage is done, and it is obvious, and it is significant, and it must be fixed."

15.    Steadman was not happy with the conversation and promptly hired another company to test in a manner that would show zero mold.

16.    Steadman then hired Environmental Solutions to conduct the mold test.  On September 10, 2020, Charles Dixon who made a perfunctory "visual inspection" of the residence found "there were no further signs of moisture or mold observed at the time of the survey." He only inspected the "hall, bathroom, and outside.

His report stated: "This report refers only to those areas tested at the time of testing. A future water event may cause mold in the home that is not covered by this test. *Areas of the house that were not tested may contain areas of mold that are not covered under these tests.*" (Italics added.)

17.    Kink then told Fry that she was going to get a third test performed to see what might show up, since Fry was concerned that the existence of mold might make it a health hazardous and risk his family's health if they moved in.

18.   The Hirano's indicated at Paragraph 19 of the Seller's Disclosures that they had made energy efficiency improvements to the property but failed to describe those improvements.

19.   At no time did Fry receive any receipts, invoices, or notices of repair or other proof from Kink or Jaquelyn Hirano regarding what repairs had been made. In fact the Hirano's had no intention of making any repairs as proved by every service provider from the lawn service that was to repair the sprinklers to the pool service that was to repair the pool equipment to the electrician who was supposed to correct the  numerous electrical problems, all said the same thing, "she [Jaquelyn Hirano] told me not to fix it because she wasn't putting another penny into the house; the new owner can deal with it."

20.   Fry relied on his agent Makenzie Kink to handle the inspection repairs on his behalf.

21.   When the fact that no repairs had been made was brought to the attention of Windermere President Grady Kohler his excuse was, "We are not foremen for the jobs."

22.   On August 20, 2020, Defendant Kink acknowledged in an email from the property inspector, Ryan Johnson and copied to Fry, that she had been made aware of the mold problem and that the sliding doors upstairs did not have a cap flashing nor pan flashing and that the "Seller's are hoping on it for us." This Sellers never fixed these problems.

23.   Kink knew and further knew that Fry didn't know that the damage to the ceiling, walls, baseboards, and sliding doors both upstairs and downstairs was more than originally anticipated. She also knew that the cost to the Hiranos would be more than Steadman had

originally discussed with them. Steadman and Kink colluded with each other to withhold this information from Fry and not put the deal at risk.

24.  On August 28, Language to Addendum to No. 7 was mutually agreed to remove the 1.5 times cap to expenses to simply state that all repairs would be made prior to closing.

25.  After the closing, Fry met with the mold expert Brent Bowthorpe at the property to review the items that should have been fixed and learned for the first time that none of the repairs had been made.

26.  On Sept 29 when Fry was given keys to the house, he discovered that the sliding doors where mold existed had not been repaired or replaced. He called Kink to find out what plans were in place to do the repairs so he could follow up on the matter and quickly resolve the issue. Kink sent a message to Fry explaining that the Sellers decided to not replace the doors because the "guy" Steadman sent out did not find any mold with his test.

27.  Kink, as Fry's agent, admitted she had not attended the site visit with mold expert Brent Bowthorpe on Fry's behalf as she had promised. As a result, she had no firsthand knowledge of the extent of the mold or the many repairs that were necessary.  Moreover, the "guy" Steadman recruited [allegedly Charles Dixon] to find there was "no mold" never engaged or communicated with the mold experts originally hired by Kink and Windermere as to the disparity in his findings as to theirs. His visual inspection was cursory at best.

28.  It was agreed per Addendum 7 that the sliding doors and anything else in and around the doors would be repaired or replaced. At no time did the Parties have an agreement that the repairs or replacements would not be made after signing of Addendum No 7. The

Seller, Windemere, Steadman, and Kink conspired to fabricate a false test in order to get the desired outcome to use as an excuse to not abate the mold or perform the repairs and replacements agreed to in writing.

**Damages**

29.  Defendants knew that critical information was deliberately withheld from Fry and was done in collusion to protect the sale and benefit to Windemere, Steadman, and Kink at the expense of injury to Fry.

30.  Fry was out of town on Friday September 25, 2020, the day of the closing and sought to have an addendum to the closing extended from Friday to Monday, September 28, so he would have time to return home and inspect the residence before closing. Defendants, Windermere, Steadman, and Kink, refused and threatened to sell to another buyer if Fry did not close on that Friday.

31.  Fry capitulated and closed at a designated location with the understanding that the damaged areas were or would be fixed.

32.  Upon returning home and finding the repairs had not been made and the mold infestation was not abated, and the sliding doors were not replaced, he and his family were not able to move into the home.

33.  Fry was concerned about the mold in the walls, which would cause health risks, and the unknown cost to fix the water damage as well as the other repairs.

34.  Fry and his family were compelled to find other housing and incur unnecessary expense until the house could be put in a healthy, livable condition. It would be months.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Fraud–Intentional Misrepresentation**
**(Against all Defendants)**

35.  Plaintiff incorporates every allegation contained in the preceding paragraphs, as though fully set forth herein.

36.  Defendant, Windermere by and through its agents, Scott Steadman and Makenzie Kink made representations of fact to Fry by misleading him into a buying a home for 1.4-million dollars that was rife with problems in need of repair through deliberately providing false and misleading information that the problems found in the Veteran Edge Inspections Report had been repaired, when they knew they had not been repaired and the Hiranos had no intention of making the repairs as stated by Takuya Hirano's sister, Defendant Jacquelyn Hirano that they were not going to put another penny into the house and the buyer could make the repairs.

37.  An additional act of fraud occurred in the Seller's Disclosures where the Seller dishonestly said the home had a "brand new roof," when in fact a stretch of 19 feet above the sliding doors where the damage occurred on the top floor and main floor, was leaking and never disclosed to Fry.

38.  Another act of fraud happened when the Seller stated in his Disclosures that the appliances were "all brand new," which Hirano knew was untrue.

13

39.    Another act of fraud happened when the Seller stated in his Disclosures that the sprinkler system was "brand new," the year before in 2019. which was also untrue.

40.    A further act of fraud occurred when Seller's Agent Scott Steadman attempted to circumvent the mold expert's report of severe mold infestation, saying he knew someone who would find there was zero mold by hiring an alleged mold expert to test areas of the home that had no mold and using that report to say there was no mold.

41.    The representations were in fact false.

42.    The representations were material.

43.     Hirano and Windermere through their agents and representatives knew of the falsity of the representations.

44.    Hirano, Windermere and their agents intended that the Plaintiff act and rely on their representations.

45.    The Plaintiff did not know of the falsity of the representations.

46.    The Plaintiff did in fact rely on the truth of the representations.

47.    The Plaintiff had a right to rely on the representations, and

48.     Plaintiff's reliance on the misrepresentations caused the damages herein after alleged, including attorney fees and costs.

49.     The Defendants' conduct was oppressive, fraudulent, and malicious, and constitutes despicable conduct in conscious disregard for Plaintiff's rights. As a result of

Defendants' fraud, Plaintiff is entitled to punitive and exemplary damages, also under

Utah Civil Code 78B-8-201. Plaintiff seeks punitive and exemplary damages in the sum

of $2,000,000.00.

## SECOND CAUSE OF ACTION
### Fraud–Concealment
### (Against all Defendants)

50.     Plaintiff incorporates every allegation contained in the preceding paragraphs,

as though fully set forth herein.

51.     Defendant, Windermere. and Kink intentionally failed to disclose

pertinent information regarding the property to Fry by omitting to disclose past

damage and defects to the home.

52.     The Defendants concealed or suppressed material facts.

53.      The Defendants had knowledge of these material facts.

54.      These material facts were not within reasonably diligent attention,

observation, and judgment of the Plaintiff.

55.      The Defendants suppressed or concealed these facts with the intention that

the Plaintiff would be misled as to the true condition of the property.

56.      The plaintiff was reasonably so misled.

57.      As a result, the Plaintiff suffered damages, the full amount to be determined

at the time of trial including interest, legal fees and costs.

58.      The Defendants' conduct was fraudulent, and malicious, and constitutes

despicable conduct in conscious disregard for Plaintiffs' rights. As a result of Defendants' fraud Plaintiff is entitled to punitive and exemplary damages, also under Utah Civil Code 78B-8-201. Plaintiff seeks punitive and exemplary damages in the sum of $2,000,000.00.

### THIRD CAUSE OF ACTION
### Promissory Fraud
### (Against all Defendants)

59.     Plaintiff incorporates every allegation contained in the preceding paragraphs, as though fully set forth herein.

60.     Promissory fraud occurred when Hirano through his agents entered into the Real Estate Purchase Contract with Fry by fraudulently disclosing the age and condition of the roof, appliances, sprinkler system, pool, and electrical system as new or newly repaired and promising after the closing that all repairs would be made, including the abatement of the mold and the replacement of the sliding glass doors.

61.     Windermere and its agents and representatives undervalued the cost of the repairs and the abatement of the mold, and then deceitfully obtained a mold report of mold free areas of the home and asserted there was no mold despite the previous in-depth inspection and testing by two previous inspectors.

62.     Defendants promised to perform but had no intention of doing so.

63.     The misrepresentations were knowing or scienter, since Defendants knew their intent was not to perform.

16

64.     The misrepresentations were material.

65.     Fry reasonably relied on Defendants' misrepresentations by closing the purchase in reliance on his Agent Kink's representations.

66.     The whole point of Defendants' representations of intent to perform was to make it appear to Fry that he could rely on Defendants' performance. However, it was merely a sham; there was never any intent to perform.

67.      Defendants' breach was the actual and proximate cause of Fry's damages.

68.      As a result, Fry suffered damages, the full amount to be determined at the time of trial including interest, legal fees and costs.

69.     The Defendants' conduct was fraudulent, malicious, and constitutes despicable conduct in conscious disregard for Plaintiffs' rights. As a result of Defendants' fraud, Plaintiff is entitled to punitive and exemplary damages, also under Utah Civil Code 78B-8-201. Plaintiff seeks punitive damages in the sum of $2,000,000.00.

**FOURTH CAUSE OF ACTION**
**Negligence**
**(Against all Defendants)**

70.     Plaintiff incorporates every allegation contained in the preceding paragraphs, as though fully set forth herein.

71.     Negligence is a failure to exercise appropriate and ethical care when it is foreseeable that failure to do wo would cause harm to another.

72.     In this case, Windermere as the limited or designated broker and Kink as Fry's

agent had a relationship with Fry as the buyer that required Windermere and Kink to act in Fry's best interest.

73.     Once an agency relationship was established Windermere and Kink owed Fry a fiduciary duty of loyalty and obedience. They were required to place their clients' interests ahead of their own, providing services with honesty and good faith while avoiding conflicts of interest or self-dealing.

74.     Windermere and Kink breached their duty to Fry by not doing their due diligence to discover information about the property or for not performing their duties as a broker or agent in a timely, careful or effective manner.

75.     As a result of their breach, Fry has suffered damages in an amount that is not fully known at this but will be determined at the time of trial.

**FIFTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(Against all Defendants)**

76.     Plaintiff incorporates every allegation contained in the preceding paragraphs, as though fully set forth herein.

77.     Agents/Defendants, Kink and Steadman created a conflict of interest and breached the duty of designated agents by not representing the buyer and seller individually as though there was no designated agency. They breached their duty of confidentiality and fiduciary responsibility in placing their employer Windermere Realty and their own commissions ahead of their clients.

78.     This is established by the failure of Fry's agent, Makenzie Kink to reveal the mold inspector's report of the severe mold infestation in the home with Fry and only sharing it with seller's agent Scott Steadman.

79.     Windermere and Kink's negligent misrepresentation is further established by not granting Fry's request to extend the closing of the sale from the Friday scheduled closing to Monday so Fry could inspect the house and confirm that all repairs had been made, since he was out of town. Instead, he was told that if he didn't close on Friday the house would be sold to another buyer. Kink and Steadman knew the mold had been covered up, not removed, and the other problems unfixed.

80.     The Defendants represented to Fry that the interior and exterior problems including the mold as listed in the inspection reports by qualified inspectors hired by Windermere and its agents would be fixed either before closing or as agreed by addendum to the Purchase Contract, after the closing.

81.     The Defendants negligently undervalued the repair costs and then sought to diminish the need of the repairs or disregard making the repairs altogether.

82.     Defendants represented fabricated facts that were untrue. The fabricated mold report is just one example.

83.     At the time the Defendants misrepresented facts to Plaintiff they had no reasonable grounds for believing the representations were in fact true.

84.     The Defendants intended that Plaintiff rely on the representations.

85.     Plaintiff did reasonably rely on Defendants' representations. After all

Plaintiff was forbidden to examine the home before making an offer on the home, and then was denied an addendum to extend closing of a mere two days so he could return from being out of town and inspect the home and confirm the repairs had been completed before closing. Nevertheless, his Agent, Kink, represented that any remaining repairs would be completed after the closing. Defendants had no intention of performing any repairs after the closing.

86.     Defendant Windermere as the broker and Kink as Fry's agent breached their fiduciary duty to Fry whey they neglected to act in Fry's best interest or with the highest standard of care. Because Windermere is the broker in this limited or designated agency it has a duty along with the agent to act with honesty and trust. In failing to do so they breached their fiduciary duty to Fry.

87.     In relying on Defendants' representations, Plaintiff was harmed financially.

88.     Plaintiff's reliance on Defendants' representations were a substantial factor in causing his harm.

89.      As a result, the Plaintiff suffered damages, the full amount to be determined at the time of trial including interest, legal fees and costs.

90.      The Defendants' conduct was fraudulent, and malicious, and constitutes despicable conduct in conscious disregard for Plaintiffs rights. As a result of Defendants' fraud, Plaintiff is entitled to punitive and exemplary damages also under Utah Civil Code 78B-8-201. Plaintiffs seek punitive and exemplary damages in the sum of $2,000,000.00.

**SIXTH CAUSE OF ACTION**

20

**Breach of Contract**
**(Against Windermere Real Estate-Utah, LLC)**

91.     Plaintiff incorporates every allegation contained in the preceding paragraphs, as though fully set forth herein.

92.     Fry made an offer on August 3, 2020, with Addendums 1 and 2, accepted by the Sellers on August 5, 2020.

93.      Sellers Disclosures were provided to Fry on August 7, 2020.

94.     On or about August 5, 2020, Plaintiff and Defendant entered into a Real Estate Purchase Contract prepared by Defendant, Windermere.

95.     Fry made an offer on August 3, 2020, with Addendums 1 and 2, accepted by the Seller on August 5, 2020.

96.     Seller's Disclosures were provided to Fry on August 7, 2020.

97.     Another provision of the Contract required a licensed, qualified inspector to inspect the home and in its report list all problems that would require repair and affect the Buyer's completing the purchase of the home.

98.     A breach of the Contract occurred when Hirano failed to uphold his part of the Contract with no sufficient legal cause by fraudulently making misrepresentations as to the age and condition of the roof, the pool, the appliances, the sprinkler system, the electrical, the mold infestation, and the overall condition of the home.

99.     Anticipatory breaches transpired, through both words and deeds that signaled the Seller, Hirano would not uphold his part of the Contract when, through his agents, he

failed to make the necessary repairs and maintenance of the home and his sister divulged that Hirano would not put another penny into the home.

100.     The breaches of contract became more egregious when Seller's Agent, Steadman sought a misleading mold report to avoid having to abate the mold found by two previous mold expert inspectors.

101.     Defendants' final breach of the Contract occurred by promising to make the repairs including the abatement of the mold after the closing of escrow and refusing to do so.

102.     Plaintiff did all the Contract required of him or that was otherwise excused or waived.

103.     Defendants' breach of the Contract caused serious harm to Plaintiff in an amount that has not been full ascertained but will be presented at the time of trial together with interest, legal fees, and costs.

## SEVENTH CAUSE OF ACTION
### Breach of Covenant of Good Faith and Fair Dealing
### (Against all Defendants)

104.     Plaintiff incorporates every allegation contained in the preceding paragraphs, as though fully set forth herein.

105.     Defendants' bad faith conduct supports a claim for breach of implied covenant of good faith and fair dealing.

106.     Every contract imposes upon each party a duty of good faith and fair dealing

in its performance and its enforcement. (Restatement 2nd.of Contracts § 205).

107.     Defendants were the drafter of the Real Estate Purchase Contract.

108.     Defendants deliberately misrepresented facts and promises and committed acts of fraud to avoid performing its obligations under the Contract.

109.     In addition to the wrongful and illegal acts, Defendants failed and refused to discharge their contractual responsibilities that unfairly frustrated the Contract's purpose and disappointed the Plaintiffs expectations.

110.     Defendants' breach deprived the Plaintiff of his contract benefits.

111.     As a result, Plaintiff has suffered damages in an amount to be fully determined at trial, including interest, legal fees, and costs.

**EIGHTH CAUSE OF ACTION**
**Civil Conspiracy**
**(Against all Defendants)**

112.     Plaintiff incorporates every allegation contained in the preceding paragraphs, as though fully set forth herein.

113.     Civil conspiracy occurred when Windermere, Steadman, and Kink agreed to engage in an activity to accomplish the unlawful purpose of fraudulently concealing the expert's mold report and the engaging a pseudo mold expert to fabricate a report that no mold existed, which caused substantial harm to Plaintiff.

114.     The civil conspiracy continued when Windermere, Steadman, and Kink worked to achieve the wrongful goal of agreeing to misrepresent essential facts to Fry and

23

deliberately concealing facts concerning the findings of the experts' inspections about the condition and state of the home's interior and exterior and the status and abatement of the mold.

115.    As a result of the said Defendants' tortious and unlawful acts, Plaintiff has suffered economic loss in an amount consistent with the other tortious acts alleged herein, including attorney fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment against Defendants on all causes of action, as follows:

1.    For general, specific, compensatory, incidental, and consequential damages according to proof at trial, but not less than Plaintiffs' initial investment and damages.

2.    For disgorgement and restitution of all profits and gains obtained by the unlawful, unfair, fraudulent acts and omissions alleged herein according to proof at trial.

3.    For punitive and exemplary damages in the sum of $2,000,000.00 or according to proof.

4.    For pre-and-post-judgment interest, as allowed by law.

5.    For an award of costs of suit incurred herein in this action.

6.    For an award of Plaintiffs' attorneys' fees, costs, and other expenditures incurred in connection with this action.

7.    For daily costs for alternate housing caused by not being able to move into the new home at the rate of $210 per day.

8.   For monthly rent on alternate housing where the Frys were required to live until their home was livable and free of any health risk at $1,500 per month.

9.   For utilities at the new home while repairs were being made and Fry was unable to live according to proof.

10.  Vacant Homeowners Policy that was forced in place due to Fry not being able to move in; and

11.  For such other and further relief as the Court may deem proper.

## DEMAND FOR JURY

Plaintiff demands trial of all issues by jury.

DATED: July 23, 2021.

LAW OFFICES OF DANNY QUINTANA

By:   /s/ Danny Quintana
      *Attorney for Plaintiff*
      Thomas Fry